# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | ) ) ) | Master File No. 12-md-02311 |
|  | ) | Case No. 2:12-cv-00602 |
| In re: | ) ) | Hon. Marianne O. Battani |
| OCCUPANT SAFETY RESTRAINT SYSTEMS | ) ) ) | Hon. Mona Majzoub |
| THIS DOCUMENT RELATES TO: | ) ) | **Jury Trial Demanded** |
| ALL DEALERSHIP ACTIONS | ) ) | |

## DEALERSHIP SECOND CONSOLIDATED CLASS COMPLAINT

Plaintiffs Martens Cars of Washington, Inc. ("Plaintiff Martens"), Landers Auto Group No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers"), Hammett Motor Company, Inc. ("Plaintiff Hammett"), Superstore Automotive, Inc. ("Plaintiff Superstore"), Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"), Westfield Dodge City, Inc. ("Plaintiff Westfield"), V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."), Desert European Motorcars, Ltd.  ("Plaintiff Desert"), Landers McLarty Fayetteville TN, LLC ("Plaintiff Fayetteville"), Dale Martens Nissan Subaru, Inc. ("Plaintiff Dale Martens"), Green Team of Clay Center Inc. ("Plaintiff Green Team"), McGrath Automotive Group, Inc. ("Plaintiff McGrath"), Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"), Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"), Landers McLarty Lee's Summit Mo, LLC d/b/a Lee's Summit Chrysler Dodge Jeep Ram and d/b/a Lee's Summit Nissan ("Plaintiff Lee's Summit"), Bonneville and Son, Inc. ("Plaintiff Bonneville"), Holzhauer Auto and Truck Sales, Inc. ("Plaintiff Holzhauer"), Pitre, Inc.,

1

d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"), Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou"),  John

Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"), SLT Group II, Inc., d/b/a Planet

Nissan Subaru of Flagstaff ("Plaintiff Planet Nissan"), Herb Hallman Chevrolet, Inc., d/b/a/

Champion Chevrolet ("Plaintiff Champion"), Charles Daher's Commonwealth Motors, Inc., d/b/a

Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda ("Plaintiff

Commonwealth Motors"), Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen

("Plaintiff Commonwealth Volkswagen"), Commonwealth Nissan, Inc., d/b/a Commonwealth

Nissan ("Plaintiff Commonwealth Nissan"), Ramey Motors, Inc. ("Plaintiff Ramey"), Thornhill

Superstore, Inc.,  d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"), Dave Heather

Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"), Central Salt

Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake

Valley"), Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"), Capitol Dealerships, Inc.,

d/b/a Capitol Toyota ("Plaintiff Capitol Toyota"), Beck Motors, Inc. ("Plaintiff Beck"), Stranger

Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"), John O'Neil Johnson Toyota, LLC

("Plaintiff Johnson"), Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"), Lee Oldsmobile-

Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"), Lee Auto Malls-Topsham, Inc. d/b/a Lee

Toyota of Topsham ("Plaintiff Topsham"), Landers of Hazelwood, LLC d/b/a Landers Toyota of

Hazelwood ("Plaintiff Hazelwood"), Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan"),

Hudson Charleston Acquisition, LLC d/b/a Hudson Nissan ("Plaintiff Hudson Nissan"), Shearer

Automotive Enterprises III, Inc. ("Plaintiff Shearer"), Apex Motor Corporation ("Plaintiff Apex"),

Rainbow Chevrolet, Inc., d/b/a Cutter Chevrolet ("Plaintiff Rainbow"), Stoebner Holdings, Inc.

d/b/a Honda Windward ("Plaintiff Windward"), Hudson Gastonia Acquisition, LLC d/b/a Gastonia

Nissan ("Plaintiff Gastonia"), Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff

Hodges"), Reno Dodge Sales, Inc. d/b/a Don Weir's Reno Dodge ("Plaintiff Don Weir"), Panama

City Automotive Group, Inc. d/b/a John Lee Nissan ("Plaintiff John Lee"), Empire Nissan of Santa

Rosa, LLC ("Plaintiff Empire Nissan") (collectively "Plaintiffs"), file this Consolidated Class

Complaint on behalf of themselves and all others similarly situated (the "Classes" as defined

below).

Plaintiffs bring this class action for damages, injunctive relief, and other relief pursuant to

federal antitrust laws and state antitrust, unfair competition, and consumer protection laws,

demand a trial by jury, and allege as follows:

## NATURE OF ACTION

1.      Plaintiffs bring this lawsuit as a proposed class action against the Defendants

(defined below), manufacturers, and suppliers of Occupant Safety Restraint Systems (defined

below) globally and in the United States for engaging in a lengthy conspiracy to suppress and

eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix,

stabilize, and maintain the prices of these products, which were sold to automobile

manufacturers in the United States and elsewhere.  The Defendants' conspiracy successfully

targeted the United States automotive industry, raising prices for car manufacturers, car and

truck dealers, and consumers.

2.      "Occupant Safety Restraint Systems" are generally comprised of the parts in an

automotive vehicle[1] that protect drivers and passengers from bodily harm. Types of different

Occupant Safety Restraint Systems include seat belts, airbags, steering wheels, and steering

systems.

3.      The "Class Period" refers to January 2003 to the present.

---

[1] "Vehicles" as used here, means any new vehicles purchased by automobile dealers throughout
the United States, including but not limited to sedans, trucks and sport utility vehicles.

4.      The Defendants manufacture, market, and sell Occupant Safety Restraint Systems throughout the United States and in other countries.

5.      Vehicles containing Occupant Safety Restraint Systems, as well as Occupant Safety Restraint Systems themselves, made by Defendants, are sold in every state of the United States and the District of Columbia.

6.      The Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to rig bids for, and to fix, stabilize, and maintain the prices of Occupant Safety Restraint Systems. They carried out their conspiracy by agreeing, during meetings and conversations, to allocate the supply of Occupant Safety Restraint Systems on a model-by-model basis. Defendants then sold Occupant Safety Restraint Systems at noncompetitive prices to automobile manufacturers in the United States and elsewhere, for sale in United States.

7.      Competition authorities in the United States and the European Union have been investigating a conspiracy in the market for Occupant Safety Restraint Systems. As part of its criminal investigation, the United States Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Occupant Safety Restraint Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of the Defendants' offices. The European Commission Competition Authority ("EC") has also conducted investigations at the European offices of several of the Defendants.

8.      Defendant Autoliv, Inc. has agreed to plead guilty and pay a $14.5 million fine for its unlawful conduct in conspiring with others to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Occupant Safety Restraint Systems sold to certain automobile manufacturers in the United

States and elsewhere at various times from at least as early as March 2006 and continuing until at least February 2011. The combination and conspiracy engaged in by Defendant Autoliv, Inc. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.    Defendant TRW Deutschland Holding Gmbh has agreed to plead guilty and to pay a total of $5.1 million in criminal fines concerning a two-count criminal investigation for fixing the prices of seatbelts, steering wheels and airbags.

10.    Defendant Toyoda Gosei Co. Ltd. has agreed to plead guilty and pay a $26 million fine for its unlawful conduct in conspiring with others to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, rig bids for, and to fix, stabilize and maintain the prices of, among other products, Occupant Safety Restraint Systems sold to certain automobile manufacturers in the United States and elsewhere at various times from at least as early as September 2003 and continuing until at least September 2010. The combination and conspiracy engaged in by Defendant Toyoda Gosei Co. Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

11.    As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Class paid artificially inflated prices for Occupant Safety Restraint Systems or for vehicles containing Occupant Safety Restraint Systems.  Plaintiffs and the members of the Classes have thereby suffered antitrust injury to their business or property.

### JURISDICTION AND VENUE

12.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman

Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. §§ 1332(d) and 1367, because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of different states than some Defendants.

14.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

15.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia:* (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Occupant Safety Restraint Systems throughout the United States that were specifically designed for vehicles that were

intended to be sold in the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; (d) was through its own actions and through the actions of its co-conspirators, engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States; (e) targeted customers in the United States, including this district, and/or (f) engaged in actions in furtherance of an illegal conspiracy in this district either itself or through its co-conspirators.  Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States and this district.

16.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable, and intended anti-competitive effects upon interstate commerce within the United States and upon import trade and commerce into the United States.

17.     The activities of Defendants and their co-conspirators were within the flow of, were intended to have, and did have, a substantial effect on interstate commerce of the United States.  Defendants' products are sold in the flow of interstate commerce.

18.     Occupant Safety Restraint Systems manufactured abroad by Defendants and sold for use in automobiles either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale and, therefore, constitute import commerce.  To the extent any Occupant Safety Restraint Systems are purchased in the United States, and such Occupant Safety Restraint Systems do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the

7

Class Period, had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

19.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Occupant Safety Restraint Systems, and that conspiracy unreasonably restrained trade and adversely affected the market for Occupant Safety Restraint Systems.

20.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Occupant Safety Restraint Systems, including Plaintiffs and the Classes.

## PARTIES

### The Plaintiffs

21.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi. Plaintiff Hammett is an authorized Ford dealer who bought Ford-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

22.     During the Class Period Plaintiff Hammett purchased vehicles containing Occupant Safety Restraint Systems manufactured by Defendants or their co-conspirators. Plaintiff Hammett also purchased Occupant Safety Restraint Systems, manufactured by Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Hammett purchased and received both the afore-mentioned vehicles and Occupant

8

Safety Restraint Systems in Mississippi.  Plaintiff Hammett has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

23.     Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas.  Plaintiff Landers is an authorized Toyota dealer who bought Toyota-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

24.     During the Class Period Plaintiff Landers purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Landers also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Landers purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Arkansas.  Plaintiff Landers has also displayed, sold, serviced, and advertised its vehicles in Arkansas during the Class Period.

25.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota.  Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore.  Plaintiff Superstore bought Buick- and GMC-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

26.     During the Class Period Plaintiff Superstore purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Superstore also purchased Occupant Safety Restraint Systems,

manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Superstore purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Minnesota.  Plaintiff Superstore has also displayed, sold, serviced, and advertised its vehicles in Minnesota during the Class Period.

27.     Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida.  Plaintiff Lee is presently an authorized GMC dealer.  During the Class Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer.  Plaintiff Lee buys GMC-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators.  During the Class Period, Plaintiff bought GMC- Pontiac-, Oldsmobile-, and Jeep-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators.

28.     During the Class Period Plaintiff Lee purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Florida.  Plaintiff Lee has also displayed, sold, serviced, and advertised its vehicles in Florida during the Class Period.

29.     Plaintiff Martens is a Maryland corporation that had its principal place of business in the District of Columbia during the Class Period.  During the Class Period Plaintiff Martens was an authorized Volvo and Volkswagen dealer who sold Volvo- and Volkswagen-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators.

30.     During the Class Period Plaintiff Martens purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators.  Plaintiff Martens also purchased Occupant Safety Restraint Systems, manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Martens purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in the District of Columbia.  Plaintiff Martens has also displayed, sold, serviced, and advertised its vehicles in the District of Columbia during the Class Period.

31.     Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who bought Chrysler-, Dodge-, and Jeep-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

32.     During the Class Period Plaintiff Westfield purchased vehicles containing Occupant Safety Restraint Systems manufactured one or more Defendants or their co-conspirators.  Plaintiff Westfield also purchased Occupant Safety Restraint Systems,

manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Westfield purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in New York.  Plaintiff Westfield has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

33.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California.  Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

34.     During the Class Period Plaintiff V.I.P. purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff V.I.P. also purchased Occupant Safety Restraint Systems, for its repair and service business, during the Class Period.  Plaintiff V.I.P. purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in California.  Plaintiff V.I.P. has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

35.     Plaintiff Desert is a California company, with its principal place of business in Rancho Mirage, California.  Plaintiff Desert is an authorized Rolls Royce, Bentley, Aston Martin, Maserati, Porsche, Jaguar, Land Rover, Audi, Lotus, and Spyker dealer who bought Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus-, and Spyker-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

36.     During the Class Period, Plaintiff Desert purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Desert also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Desert purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in California.  Plaintiff Desert has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

37.     Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee.  Plaintiff Fayetteville is an authorized Toyota dealer,  who bought Toyota-brand cars containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

38.     During the Class Period Plaintiff Fayetteville purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Fayetteville also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Fayetteville purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Tennessee.  Plaintiff Fayetteville has also displayed, sold, serviced, and advertised its vehicles in Tennessee during the Class Period.

39.     Plaintiff Dale Martens was a Kansas corporation, with its principal place of business in Lawrence, Kansas during the Class Period.  Plaintiff Dale Martens was an authorized Nissan and Subaru dealer during the Class Period, who, during the Class Period, bought Nissan-

and Subaru-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators.

40.     During the Class Period Plaintiff Dale Martens purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Dale Martens also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Dale Martens purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Kansas.  Plaintiff Dale Martens has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

41.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas.  Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge, and Ram dealer, who bought Chrysler-, Jeep-, Dodge-, and Ram-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

42.     During the Class Period Plaintiff Green Team purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Green Team also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Green Team purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Kansas.  Plaintiff Green Team has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

43.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa.  Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia, and Cadillac dealer, who bought Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia-, and Cadillac-brand cars containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

44.     During the Class Period Plaintiff McGrath purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff McGrath also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff McGrath purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Iowa.  Plaintiff McGrath has also displayed, sold, serviced, and advertised its vehicles in Iowa during the Class Period.

45.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska.  Plaintiff Table Rock is an authorized Hyundai dealer, who bought Hyundai-brand cars containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

46.     During the Class Period Plaintiff Table Rock purchased vehicles containing Occupant Safety Restraint Systems manufactured one or more Defendants or their co-conspirators.  Plaintiff Table Rock also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service

15

business, during the Class Period.  Plaintiff Table Rock purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Nebraska.  Plaintiff Table Rock has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

47.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska.  Plaintiff Archer-Perdue is an authorized Suzuki dealer, who, during the Class Period, has bought Suzuki-brand cars containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators.

48.     During the Class Period Plaintiff Archer-Perdue purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Archer-Perdue also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Archer-Perdue purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Nebraska.  Plaintiff Archer-Perdue has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

49.     Plaintiff Lee's Summit is a Missouri corporation, with its principal place of business in Lee's Summit, Missouri.  Plaintiff Lee's Summit is an authorized Chrysler, Dodge, Jeep, Nissan, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, Nissan-, and Ram-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the

Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

50.    During the Class Period Plaintiff Lee's Summit purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Lee's Summit also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Lee's Summit purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Missouri. Plaintiff Lee's Summit has also displayed, sold, serviced and advertised its vehicles in Missouri during the Class Period.

51.    Plaintiff Bonneville is a New Hampshire corporation, with its principal place of business in Manchester, New Hampshire. Plaintiff Bonneville is an authorized Dodge, Chrysler, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

52.    During the Class Period Plaintiff Bonneville purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Bonneville also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Bonneville purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in New Hampshire. Plaintiff Bonneville has also displayed, sold, serviced, and advertised its vehicles in New Hampshire during the Class Period.

53.     Plaintiff Holzhauer is a Delaware corporation, with its principal place of business in Nashville, Illinois.  Plaintiff Holzhauer is an authorized Dodge, Chrysler, and Jeep dealer, who bought Dodge-, Chrysler-, and Jeep-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

54.     During the Class Period Plaintiff Holzhauer purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Holzhauer also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Holzhauer purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Illinois.  Plaintiff Holzhauer has also displayed, sold, serviced, and advertised its vehicles in Illinois during the Class Period.

55.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico.  Plaintiff Pitre is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

56.     During the Class Period Plaintiff Pitre purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Pitre also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.

Plaintiff Pitre purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in New Mexico.  Plaintiff Pitre has also displayed, sold, serviced, and advertised its vehicles in New Mexico during the Class Period.

57.    Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan.  Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

58.    During the Class Period Plaintiff Patsy Lou purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Patsy Lou also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Patsy Lou purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Michigan.  Plaintiff Patsy Lou has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

59.    Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene is an authorized Chrysler, Dodge, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

60.    During the Class Period Plaintiff John Greene purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-

conspirators.  Plaintiff John Greene also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff John Greene purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in North Carolina.  Plaintiff John Greene has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

61.     Plaintiff Planet Nissan is an Arizona corporation, with its principal place of business in Flagstaff, Arizona.  Plaintiff Planet Nissan is an authorized Nissan and Subaru dealer, who bought Nissan- and Subaru-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

62.     During the Class Period Plaintiff Planet Nissan purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Planet Nissan also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Planet Nissan purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Arizona.  Plaintiff Planet Nissan has also displayed, sold, serviced, and advertised its vehicles in Arizona during the Class Period.

63.     Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of

the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

64.     During the Class Period Plaintiff Champion purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Champion also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Champion purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Nevada. Plaintiff Champion has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

65.     Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts. Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda, and Kia dealer, who bought Chevrolet-, Honda-, and Kia-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

66.     During the Class Period Plaintiff Commonwealth Motors purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Commonwealth Motors also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Commonwealth Motors purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Massachusetts. Plaintiff Commonwealth Motors has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

67.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

68.     During the Class Period Plaintiff Commonwealth Volkswagen purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Volkswagen also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Volkswagen purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Massachusetts.  Plaintiff Commonwealth Volkswagen has also displayed, sold, serviced and advertised its vehicles in Massachusetts during the Class Period.

69.     Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts.  Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

70.     During the Class Period Plaintiff Commonwealth Nissan purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Nissan also purchased Occupant Safety Restraint

Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Nissan purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Massachusetts.  Plaintiff Commonwealth Nissan has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

71.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.  Plaintiff Ramey is an authorized Toyota, Chrysler, Dodge, Jeep, and Ram dealer, who bought Toyota-, Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

72.     During the Class Period Plaintiff Ramey purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Ramey also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Ramey purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in West Virginia.  Plaintiff Ramey has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

73.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia.  Plaintiff Thornhill is an authorized Chevrolet, Buick, and GMC dealer, who bought Chevrolet-, Buick-, and GMC-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-

conspirators, as well Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

74.     During the Class Period Plaintiff Thornhill purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Thornhill also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Thornhill purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in West Virginia.  Plaintiff Thornhill has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

75.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin.  Plaintiff Lakeland is an authorized Toyota, Honda, Mazda, and Subaru dealer who bought Toyota- Honda-, Mazda-, and Subaru-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

76.     During the Class Period Plaintiff Lakeland purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lakeland also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lakeland purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Wisconsin.  Plaintiff Lakeland has also displayed, sold, serviced, and advertised its vehicles in Wisconsin during the Class Period.

77.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah.  Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

78.     During the Class Period Plaintiff Salt Lake Valley purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Salt Lake Valley also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Salt Lake Valley purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Utah.  Plaintiff Salt Lake Valley has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

79.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.  Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Chevrolet-, Cadillac-, and Subaru-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

80.     During the Class Period Plaintiff Capitol Chevrolet purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Chevrolet also purchased Occupant Safety Restraint Systems,

manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Chevrolet purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Oregon.  Plaintiff Capitol Chevrolet has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

81.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon.  Plaintiff Capitol Toyota is an authorized Toyota dealer, who bought Toyota-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

82.     During the Class Period Plaintiff Capitol Toyota purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Toyota also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Toyota purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Oregon.  Plaintiff Capitol Toyota has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

83.     Plaintiff Beck is a South Dakota corporation, with its principal place of business in Pierre, South Dakota.  Plaintiff Beck is an authorized Chevrolet and Cadillac dealer, who bought Chevrolet- and Cadillac-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant

Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

84.     During the Class Period Plaintiff Beck purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Beck also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Beck purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in South Dakota.  Plaintiff Beck has also displayed, sold, serviced, and advertised its vehicles in South Dakota during the Class Period.

85.     Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah.  Plaintiff Wade is an authorized Toyota dealer, who bought Toyota-brand cars containing Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators during the Class Period.

86.     During the Class Period Plaintiff Wade purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Wade also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Wade purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Utah.  Plaintiff Wade has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

87.     Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who

bought Toyota-brand cars containing Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators during the Class Period.

88.     During the Class Period Plaintiff Johnson purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Johnson also purchased Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Johnson purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Mississippi.  Plaintiff Johnson has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

89.     Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York.  During the Class Period, Plaintiff Hartley has been an authorized Honda, Buick, Pontiac, and GM dealer, who bought Honda-, Buick-, Pontiac-, and GM-brand cars containing Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators.

90.     During the Class Period Plaintiff Hartley purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hartley also purchased Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hartley purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in New York.  Plaintiff Hartley has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

91.     Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine.  Plaintiff Lee Honda is an authorized Honda dealer, who bought Honda-brand cars containing Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators during the Class Period.

92.     During the Class Period Plaintiff Lee Honda purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee Honda also purchased Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee Honda purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Maine.  Plaintiff Lee Honda has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

93.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine.  Plaintiff Topsham is an authorized Toyota dealer, who bought Toyota-brand cars containing Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators during the Class Period.

94.     During the Class Period Plaintiff Topsham purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.   Plaintiff Topsham also purchased Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Topsham purchased and received both the afore-

mentioned vehicles and Occupant Safety Restraint Systems in Maine.  Plaintiff Topsham has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

95.    Plaintiff Hazelwood is an Arkansas corporation, with its principal place of business in Hazelwood, Missouri.  Plaintiff Hazelwood is an authorized Toyota dealer, who bought Toyota-brand cars containing Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators during the Class Period.

96.    During the Class Period Plaintiff Hazelwood purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hazelwood also purchased Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hazelwood purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Missouri.  Plaintiff Hazelwood has also displayed, sold, serviced, and advertised its vehicles in Missouri during the Class Period.

97.    Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi.  Plaintiff Cannon is an authorized Nissan dealer, who bought Nissan-brand cars containing Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators during the Class Period.

98.    During the Class Period Plaintiff Cannon Nissan purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Cannon Nissan also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service

business, during the Class Period. Plaintiff Cannon purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Mississippi. Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

99. Plaintiff Hudson Nissan is a South Carolina limited liability company with its principal place of business in North Charleston, South Carolina. Plaintiff Hudson Nissan is an authorized Nissan dealer, who bought Nissan-brand cars containing Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by the Defendants or their co-conspirators during the Class Period.

100. During the Class Period Plaintiff Hudson Nissan purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Hudson Nissan also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Hudson Nissan purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in South Carolina. Plaintiff Hudson Nissan has also displayed, sold, serviced, and advertised its vehicles in South Carolina during the Class Period.

101. Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont. Plaintiff Shearer is an authorized Honda dealer, who bought Honda-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

102.     During the Class Period Plaintiff Shearer purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Shearer also purchased Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Shearer purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Vermont.   Plaintiff Shearer has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

103.     Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont.   Plaintiff Apex is an authorized Acura dealer, who bought Acura-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

104.     During the Class Period Plaintiff Apex purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Apex also purchased Occupant Safety Restraint Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Apex purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Vermont.   Plaintiff Apex has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

105.     Plaintiff Rainbow is a Hawaii corporation, with its principal place of business in Honolulu, Hawaii. Plaintiff Rainbow is an authorized Chevrolet dealer who bought Chevrolet-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of

the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

106.    During the Class Period Plaintiff Rainbow purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.    Plaintiff Rainbow also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Rainbow purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Hawaii.   Plaintiff Rainbow has also displayed, sold, serviced and advertised its vehicles in Hawaii during the Class Period.

107.    Plaintiff Windward is a Hawaii corporation, with its principal place of business in Kaneohe, Hawaii.   Plaintiff Windward is an authorized Honda dealer, who bought Honda-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

108.    During the Class Period Plaintiff Windward purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.    Plaintiff Rainbow also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the class period.   Plaintiff Windward purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Hawaii.   Plaintiff Windward has also displayed, sold, serviced and advertised its vehicles in Hawaii during the Class Period.

109.    Plaintiff Gastonia is a North Carolina limited liability company with its principal place of business in Gastonia, North Carolina.   Plaintiff Gastonia is an authorized Nissan dealer,

33

who bought Nissan-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

110.    During the Class Period, Plaintiff Gastonia purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators.    Plaintiff Gastonia also purchased Occupant Safety Restraint Systems, manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the class period.   Plaintiff Gastonia purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in North Carolina. Plaintiff Gastonia has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

111.    Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer, who bought Subaru-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

112.    During the Class Period, Plaintiff Hodges purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.   Plaintiff Hodges also purchased Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period.   Plaintiff Hodges purchased and received both the afore-mentioned vehicles and

Occupant Safety Restraint Systems in Michigan. Plaintiff Hodges has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

113.   Plaintiff Don Weir is a Nevada corporation with its principal place of business in Reno, Nevada. Plaintiff Weir is an authorized Chrysler, Dodge and Jeep dealer, who bought Chrysler-, Dodge- and Jeep-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

114.   During the Class Period, Plaintiff Don Weir purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Don Weir also purchased Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period. Plaintiff Don Weir purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Nevada. Plaintiff Weir has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

115.   Plaintiff John Lee is a Florida corporation with its principal place of business in Panama City, Florida. Plaintiff John Lee is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

116.   During the Class Period, Plaintiff John Lee purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff John Lee also purchased Occupant Safety Restraint Systems

manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period.  Plaintiff John Lee purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in Florida.  Plaintiff John Lee has also displayed, sold, serviced, and advertised its vehicles in Florida during the Class Period.

117.    Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California.  Plaintiff Empire Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators, as wells as Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

118.    During the Class Period, Plaintiff Empire Nissan purchased vehicles containing Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators.   Plaintiff Empire Nissan also purchased Occupant Safety Restraint Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period.  Plaintiff Empire Nissan purchased and received both the afore-mentioned vehicles and Occupant Safety Restraint Systems in California.   Plaintiff Empire Nissan has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

**The Defendants**

**TRW Defendants**

119.    Defendant TRW Automotive Holdings Corp. ("TRW U.S.") is a Delaware corporation with its principal place of business in Livonia, Michigan. TRW U.S., directly or through its wholly-owned and/or controlled subsidiaries, manufactured, marketed, and/or sold

Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.

120.    Defendant TRW Deutschland Holding Gmbh ("TRW Germany") is a German corporation with its principal place of business in Koblenz, Germany.  Defendant TRW Germany is a subsidiary of and wholly-owned and/or controlled by Defendant TRW U.S.  Defendant TRW Germany, directly and/or through its subsidiaries which it wholly owned and/or controlled, manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.  At all times during the Class Period, its activities were under the control and direction of TRW U.S., which controlled its policies, sales, and finances.

121.    TRW Germany and TRW U.S. are collectively referred to as "TRW."

**Takata Defendants**

122.    Defendant Takata Corp. is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Takata Corp. directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.

123.    Defendant TK Holdings, Inc. ("TK"), is a Delaware corporation with its principal place of business in Auburn Hills, Michigan. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Takata. Defendant TK manufactured, marketed, and/or sold

Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

124. Executives who have worked at Takata Corp., in Japan, have also worked at TK, in the U.S. Yoshiyasu Kikuchi, an executive officer at Takata Corp. is a director at TK. Yoichiro Nomura, the Chief Financial Officer at Takata Corp. is a director at TK. Juichiro Takada, the former Chairman and CEO of Takata Corp. was also a director at TK. Shunkichi Shimizu, a former executive officer at Takata Corp., in charge of "America Operations" was also the president and secretary of TK Holdings. Takata Corporation also refers to TK Holdings as its American headquarters, stating "Takata's regional headquarters for the Americas is in Auburn Hills, Michigan."

125. Takata has targeted the U.S. and U.S. customers in myriad ways. Takata's annual report states that "Takata and GM jointly developed a front center airbag, which will be installed in GM's 2013 models." http://www.takata.com/ir/pdf/material05/120831ar_en.pdf at 36. Takata's 2011 report states that "auto industry in North America is expected to continue its recovery, and we will tap growing demand for high value added safety products such as curtain airbags and side airbags . . . " http://www.takata.com/ir/pdf/material05/110829ar_en.pdf at 11. Takata's 2011 report reviewed new U.S. regulations regarding automotive restraints, which it deemed "driver[s] of growth," for its business. *Id.* at 20. Takata's report also announces that "[i]n April 2010, Takata Corporation was chosen by Ford Motor Company to be one of 13 suppliers newly added to Ford's Aligned Business Framework (ABF) for closer collaboration

and long-term partnership." It also states that "[t]he close proximity of Ford and Takata's North American headquarters in southeast Michigan has enabled synergies that in recent years have strengthened the partnership between the two companies." *Id.* at 22. Takata's report also mentions specific initiatives aimed at the U.S. market including "buckle-up campaigns, child restraint training sessions at maternity classes, anti drunk driving campaigns, and skill improvement courses such as those we run in the United States."

126. Defendants Takata Corp. and TK are collectively referred to as "Takata."

**Autoliv Defendants**

127. Defendant Autoliv, Inc. ("Autoliv") is a Delaware corporation with its principal place of business in Stockholm, Sweden. Defendant Autoliv, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.

128. Defendant Autoliv ASP, Inc. is an Indiana corporation with its principal place of business in Ogden, Utah. It is a subsidiary of and wholly owned and/or controlled by its Swedish parent, Autoliv, Inc. Defendant Autoliv ASP, Inc. manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were under the control and direction of its Swedish parent, which controlled its policies, sales, and finances.

129.    Defendant Autoliv B.V. & Co. KG is a German corporation with its principal place of business in Elmshorn, Germany. It is a subsidiary of and wholly owned and/or controlled by its Swedish parent, Autoliv, Inc. Defendant Autoliv B.V. & Co. KG manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Swedish parent, which controlled its policies, sales, and finances.

130.    Autoliv Japan Ltd. is a Japanese corporation with its principal place of business in Yokohama, Japan. It is a wholly owned and/or controlled subsidiary of Autoliv, Inc. Autoliv Japan Ltd. manufactured, marketed, and/or sold Automobile Occupant Safety Systems that were purchased throughout the United States, including in this district, the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Swedish parent, which controlled its policies, sales, and finances.

131.    Defendants Autoliv, Inc., Autoliv ASP, Inc., Autoliv B.V. & Co. KG and Autoliv Japan Ltd. are collectively referred to as "Autoliv."

**Tokai Rika Defendants**

132.    Defendant Tokai Rika Co., Ltd. is a Japanese corporation with its principal place of business in Aichi, Japan. Defendant Tokai Rika Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including

in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.

133. Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Tokai Rika Co., Ltd. Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

134. Executives who have worked at Tokai Rika Co. Ltd. have also worked at TRAM, Inc. For instance, Masayuki Morita, the President and Chief Operating Officer at TRAM, Inc. previously served as a Managing Director and Director at Tokai Rika Co., Ltd. Yoshihei Iida, the former Chairman of Tokai Rika Co. Ltd., is a Board member at TRAM, Inc. Kiyoshi Kinoshita, the former Chairman of the Board and Representative Director, at Tokai Rika Co. Ltd., was also previously the President of TRAM, Inc.

135. The same year that TRAM was established in the U.S., Tokai Rika received its "QS9000 certification," a quality standard the possession of which was required by the three major U.S. manufacturers: Ford, GM and Chrysler.

136. Defendants Tokai Rika Co., Ltd. and TRAM, Inc. are collectively referred to as "Tokai Rika."

41

**Toyoda Gosei Defendants**

137.    Toyoda Gosei Co., Ltd. ("Toyoda Gosei") is a Japanese corporation with its principal place of business in Aichi, Japan.   Toyoda Gosei—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members..

138.    Toyoda Gosei North America Corp. is a Michigan corporation with its principal place of business in Troy, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Toyoda Gosei.  Toyoda Gosei North America Corp. manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

139.    TG Missouri Corp. is a Missouri corporation with its principal place of business in Perryville, Missouri.  It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Toyoda Gosei.  TG Missouri Corp. manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

## AGENTS AND CO-CONSPIRATORS

140.    Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged.

141.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

142.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.  The Occupant Safety Restraint Systems Industry

143.    Occupant Safety Restraint Systems are generally comprised of the parts in an automotive vehicle that protect drivers and passengers from bodily harm. Occupant Safety Restraint Systems include seat belts, air bags, steering wheels (or steering systems), and safety electronic systems.



Figure 1

43

144.     Occupant Safety Restraint Systems are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process. They are also installed in cars to replace worn out, defective, or damaged Occupant Safety Restraint Systems.

145.     When purchasing Occupant Safety Restraint Systems, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers—Occupant Safety Restraint Systems are not commodity items.  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs and the OEMs usually award the business to the selected automotive parts supplier for four to six years.  Typically, the bidding process begins approximately three years prior to the start of production of a new model.

146.     Suppliers, including Defendants, supply OEMs with both Occupant Safety Restraint Systems to be installed in vehicles and Occupant Safety Restraint Systems to be used for replacement purposes.

147.     The Defendants and their co-conspirators supplied Occupant Safety Restraint Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  The Defendants and their co-conspirators manufactured Occupant Safety Restraint Systems (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) abroad for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) abroad for installation in vehicles manufactured abroad for export to and sale in the United States.

148.     TRW's main customers include: GM, Chrysler, Ford, Mercedes, Renault, Nissan, Fiat, Toyota, BMW, Honda, Hyundai and Volkswagen.

149.    Takata's main customers include: Toyota, Honda, BMW, Mazda, Nissan, GM, Chrysler and Ford.

150.    Autoliv's main customers include:  GM, Ford, Nissan, Renault, Hyundai, Kia, VW, Chrysler, Fiat, Honda, Toyota, BMW, Mercedes, Daimler and Volvo.

151.    Tokai Rika's main customers include: Toyota, Subaru, SAAB, Volvo, Nissan, Subaru, Isuzu, GM, Ford, Suzuki, Mazda, Isuzu, Mitsubishi and Chrysler.

152.    Plaintiffs and members of the proposed Classes purchased Occupant Safety Restraint Systems indirectly from the Defendants and their co-conspirators.  By way of example, automobile dealers indirectly purchase Occupant Safety Restraint Systems from the Defendants when they purchase new vehicles to sell or lease to consumers.  Likewise, when repairing a damaged vehicle or when the vehicle's Occupant Safety Restraint Systems are defective, Plaintiffs and other automobile dealers indirectly purchase replacement Occupant Safety Restraint Systems from Defendants.

153.    Replacement Occupant Safety Restraint Systems sold by OEMs to dealerships are the same as the Occupant Safety Restraint Systems installed in vehicles and are made by the same manufacturer who made the Occupant Safety Restraint Systems originally installed—that is the purpose of an OEM part, made by the OEM supplier.  Such replacement parts are not the same as aftermarket parts, which are made by different manufacturers than those who manufactured the original parts.  The prices of replacement Occupant Safety Restraint Systems were inflated by Defendants' collusion.

154.    According to Autoliv's 2011 Annual Report, the global market for Occupant Safety Restraint Systems in 2010 was $18.1 billion and the North American market for Occupant Safety Restraint Systems was $4.2 billion.

155.    The global Occupant Safety Restraint Systems market is dominated and controlled by large manufacturers, the top three of which are Defendants who control almost 75% of the market. The Autoliv Defendants account for more than 33% of the global market for Occupant Safety Restraint Systems; as Autoliv states in its 2011 Annual Report, it is "the world's largest automotive safety supplier with sales to all the leading car manufacturers in the world." TRW accounts for approximately 20% of the global market for Occupant Safety Restraint Systems. And the Takata Defendants account for approximately 20% of the Occupant Safety Restraint Systems global market.

156.    By virtue of their market shares, Defendants are the dominant manufacturers and suppliers of Occupant Safety Restraint Systems in the United States and the world.

157.    Airbags are a type of Occupant Safety Restraint System. Airbags are occupant restraints designed to control the movement of an occupant inside a vehicle in the event of a collision. An Airbag consists of a light fabric air bag, an inflator, which, through use of pressurized gas (typically generated by pyrotechnic materials), rapidly inflates the Airbag upon deployment, and an initiator to initiate the deployment. It may also include, depending on the requirements of the vehicle manufacturer, an injection molded plastic decorative cover or other devices associated with the Airbag. According to the National Highway Traffic Safety Administration, a typical new Airbag retailed for approximately $1,000 from a car dealer in 2011.

158.    In 2012, the total dollar-value of Airbags sold in the U.S. reached $6.7 billion.

159.    According to Autoliv's website, it manufactures more than one-third of the Airbags sold in North America, and according to its 2011 10-K, Autoliv manufactures more than

40% of the side Airbags and almost 30% of the frontal Airbags sold in the world. TRW, Takata and Toyoda Gosei are also major manufacturers of Airbags.

160.     Seatbelts are another type of Occupant Safety Restraint System. Seatbelts are safety strap restraints designed to secure an occupant in position in a vehicle in the event of a collision. A Seatbelt includes belt webbing, a buckle, a retractor, and hardware for installation in a vehicle. It may also include, depending on the requirements of the vehicle manufacturer, a height adjuster, a pretensioner, or other devices associated with the Seatbelt.  In 2012, the total dollar-value of Seatbelts sold in the U.S. reached over $900 million.

161.     According to Autoliv's website, it manufactures almost one-third of the Seatbelts sold in North America, and according to its 2011 10-K, Autoliv manufactures 40% of the Seatbelts sold in the world. TRW and Takata are also major manufacturers of Seatbelts.

162.     Steering Wheels are another type of Occupant Safety Restraint System. Steering Wheels consist of a die-cast armature (frame) covered by molded polyurethane. Steering Wheels are then finished with leather, wood trim, or plastic, and may include various electronic features and controls, depending on the requirements of a vehicle manufacturer.

163.      In 2012, the dollar-value for Steering Wheels and related components sold in the U.S. reached $2.24 billion.

164.     According to its website, Autoliv manufactures more than 15% of the Steering Wheels sold in North America, and in its 2011 10-K, Autoliv states that it manufactures almost 30% of the Steering Wheels sold in the world. TRW, Takata and Toyoda Gosei are also major manufacturers of Steering Wheels.

> **B.   The Structure and Characteristics of the Occupant Safety Restraint Systems Market Render the Conspiracy More Plausible.**

165.    The structure and other characteristics of the Occupant Safety Restraint Systems market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in these markets.  Specifically, the Occupant Safety Restraint Systems market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

**1.  The Occupant Safety Restraint Systems Market Has High Barriers to Entry.**

166.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

167.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Occupant Safety Restraint Systems market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

168.    In addition, an OEM cannot freely change its suppliers of Occupant Safety Restraint Systems because OEMs design the features of their vehicles, including the electronics, mechanics, thermal distribution, and other features, so that they may be integrated with a selected Occupant Safety Restraint System. Thus, it would be difficult for a new competitor to enter the market after a vehicle has been specifically designed to be integrated with a particular Occupant Safety Restraint System.

169.    Research and development costs are also significant for Occupant Safety Restraint Systems, creating an additional barrier to entry. Airbags are constantly researched for better

deployment speeds, Seatbelts are constantly researched for better functionality and quality, and Steering Wheels are constantly researched for better precision and rotation.

170.    Defendants also own several patents for Occupant Safety Restraint Systems. For example, TRW owns Airbag, Steering Wheel and Seatbelt patents. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

**2.  There is Inelasticity of Demand for Occupant Safety Restraint Systems.**

171.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

172.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

173.    Demand for Occupant Safety Restraint Systems is highly inelastic. This is because there are no close substitutes for these products.  Additionally, customers must purchase Occupant Safety Restraint Systems as essential parts of a vehicle, regardless of whether prices are kept at supra-competitive levels.  Customers wanting to purchase a car simply have no choice but to purchase Occupant Safety Restraint Systems.

**3.  The Market for Occupant Safety Restraint Systems is Highly Concentrated.**

174.     Defendants dominate the Occupant Safety Restraint Systems market. Three of the Defendants control almost 75% of the global market.

### 4. Defendants Had Ample Opportunities to Conspire

175.     Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. In a June 6, 2012, press release, the DOJ explained that Defendant Autoliv and its co-conspirators met in secret and agreed to allocate the supply of various automotive parts. According to the Autoliv information, Autoliv and its coconspirators participated in meetings, conversations and communications to discuss and agree on the bids and price quotations to be submitted to certain automobile manufacturers for Occupant Safety Restraint Systems, and agreed, during meetings, conversations and communications, to allocate the supply of Occupant Safety Restraint Systems sold to certain automobile manufacturers on a model-by-model basis.

### C. Government Investigations

176.     A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada, and Japan, aimed at suppliers of automotive parts in general and Occupant Safety Restraint Systems in particular. The DOJ has confirmed that its auto parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct. Almost $1 billion in criminal fines have already been levied against various automotive parts manufacturers.

177.     The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the EC. The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers, including certain Defendants, as

part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

178.    Defendants Autoliv, TRW, and Takata have admitted that they are cooperating with the antitrust investigators. Autoliv, Inc. stated in its 2011 Annual Report that its subsidiary, Autoliv ASP, Inc., received a grand jury subpoena from the Antitrust Division of the United States Department of Justice on February 8, 2011. "The subpoena requested documents and information as part of a long-running investigation into possible anticompetitive behavior among certain suppliers to the automotive vehicle industry, including Autoliv." Autoliv, Inc.'s 2011 Annual Report also stated that, on June 7-9, 2011, representatives of the EC visited two facilities of Autoliv B.V. & Co. KG to gather information for a similar inquiry.

179.    TRW stated in its 2011 Annual Report that "in June 2011, European antitrust authorities visited certain of our Occupant Safety Systems business unit locations in Germany to gather information. We also received a subpoena related to the Antitrust Investigations in the United States from the U.S. Department of Justice."

180.    On February 23, 2010, investigators from the FBI raided the Plymouth, Michigan, offices of Tokai Rika as part of a federal antitrust investigation. Special Agent Sandra Berchtold stated that the affidavits that contain facts supporting issuance of the search warrants were filed in federal court under seal.

181.    Takata Corp. stated in its 2011 Annual Report that TK Holdings, Inc., a U.S. subsidiary, "became the subject to an investigation conducted by the Federal Bureau of Investigation on February 8, 2011. TK Holdings, Inc. is cooperating fully with the investigation." Alby Berman, vice-president of marketing and public relations for TK Holdings, Inc., said the subpoena "targeted safety system suppliers – seat belts, air bags, steering wheels and safety

electronics – any communications with competitors, and specifically mentioned Tokai Rika" and that the subpoena targeted communications dating back to January 1, 2005. Special Agent Sandra Berchtold, media coordinator for the FBI, confirmed that the FBI raided TK Holdings, Inc.'s offices in Auburn Hills, Michigan.

182.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe.

183.    To obtain the search warrant to raid TK Holdings, Inc., the FBI was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant—that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

### D.    Guilty Plea Agreements

184.    Defendant Autoliv has pleaded guilty and agreed to pay a total of $14.5 million in criminal fines concerning a two-count criminal investigation for fixing the prices of seatbelts, steering wheels, and airbags.  Autoliv has admitted to conspiring with others to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Occupant Safety Restraint Systems sold to certain automobile manufacturers in the United States and elsewhere at various times from at least as early as March 2006 and continuing until at least February 2011 in violation of the Sherman Act, 15 U.S.C. § 1. Among other things, Autoliv admitted to: (a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to

certain automobile manufacturers for Occupant Safety Restraint Systems; (b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers for Occupant Safety Restraint Systems; (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Occupant Safety Restraint Systems sold to certain automobile manufacturers on a model-by-model basis; (d) submitting bids and price quotations to certain automobile manufacturers in accordance with the agreements reached; (e) selling Occupant Safety Restraint Systems to certain automobile manufacturers at collusive and noncompetitive prices; and (f) accepting payment for Occupant Safety Restraint Systems sold to certain automobile manufacturers at collusive and noncompetitive prices.

185.     The plea agreement requires it and its subsidiaries to cooperate with the DOJ, including producing documents in their control and providing their "directors, officers and employees" for interviews and the provision of testimony in grand jury, trial and other judicial proceedings.

186.     The plea agreement further provides that upon acceptance of the agreement, the United States will not bring further criminal charges against, among other entities, Autoliv Inc.'s subsidiaries arising out of the conspiracy.

187.     Pursuant to the plea agreement, Autoliv Inc. agreed that if the United States determines that it or its subsidiaries fail to provide truthful and continuing cooperation, the United States could elect to subject Autoliv Inc. or its subsidiaries to criminal prosecution and that the United States would have the right, among other things, to prosecute both Autoliv Inc. and its subsidiaries for the conspiracy set forth in the plea agreement.

188.    In addition to Autoliv, Takayoshi Matsunaga, the former Vice President of the Toyota Global Business Unit at Autoliv Japan, pleaded guilty to a one count Criminal Information charging him with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain seat belts sold to Toyota in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  In connection with his guilty, plea, Matsunaga was criminally fined $20,000 and sentence to serve one year and one day in a U.S. prison.

189.    On October 9, 2013, Defendant Takata Corporation announced that it agreed to pay a $71.3 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts sold to automobile manufacturers, including, Toyota, Honda, Nissan, Fuji Heavy Industries, Ltd. (Subaru), and Mazda, in the United States and elsewhere from at least as early as January 1, 2003 and continuing until at least February 2011 in violation of the Sherman Act, 15 U.S.C. § 1.  According to the Information filed, Defendant Takata Corporation and its co-conspirators carried out the Occupant Safety Restraint Systems conspiracy by: (a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to automobile manufacturers for Occupant Safety Restraint Systems; (b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers for Occupant Safety Restraint Systems; (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Occupant Safety Restraint Systems sold to automobile manufacturers on a model-by-model basis; (d) submitting bids and price quotations to automobile manufacturers in accordance with the agreements reached; (e) selling Occupant Safety Restraint Systems to automobile manufacturers

at collusive and noncompetitive prices; and (f) accepting payment for Occupant Safety Restraint Systems sold to automobile manufacturers at collusive and noncompetitive prices.

190.    On November 21, 2013, the DOJ announced that three high-level Takata executives, Yasuhiko Ueno, Saburo Imamiya, and, Yoshinobu Fujino pleaded guilty to three separate one-count criminal Informations charging them with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts sold to Toyota, Honda, Nissan, Fuji Heavy Industries, Ltd. (Subaru), and Mazda in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  In connection with their guilty pleas, the Takata executives were criminally fined $20,000 each and sentenced to serve between 14 and 19 months in U.S. prison.  Ueno's criminal Information notes that was employed by Defendant TK Holdings Inc., in the United States as senior vice president for sales for Japanese manufacturers from at least January 2006 through December 2007.

191.    A fourth Takata executive, Gary Walker – employed by Defendant TK Holdings, Inc. –  pleaded guilty to a one-count criminal Information charging him with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain seatbelts sold to Toyota, Honda, Nissan, Fuji Heavy Industries (Subaru) and Mazda in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  In connection with his guilty plea, Walker was criminally fined $20,000 and sentenced to serve 14 months in a U.S. prison. A fifth Takata executive, Gikou Nakajima, was indicted on June 5, 2014 for his participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts sold to Honda, Nissan, Fuji Heavy

Industries (Subaru) and Mazda in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.

192.     Defendant TRW Germany has agreed to plead guilty and agreed to pay a total of $5.1 million in criminal fines concerning a two-count criminal investigation for fixing the prices of seatbelts, steering wheels and airbags.  TRW Germany has admitted to conspiring with others to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Occupant Safety Restraint Systems sold to certain automobile manufacturers in the United States and elsewhere at various times from at least as early as January 2008 to until at least June 2011 in violation of the Sherman Act, 15 U.S.C. § 1. Among other things, TRW Germany admitted to: (a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to certain automobile manufacturers for Occupant Safety Restraint Systems; (b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers for Occupant Safety Restraint Systems; (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Occupant Safety Restraint Systems sold to certain automobile manufacturers on a model-by-model basis; (d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers; (e) submitting bids and price quotations to certain automobile manufacturers in accordance with the agreements reached; (f) selling Occupant Safety Restraint Systems to certain automobile manufacturers at collusive and noncompetitive prices; (g) accepting payment for Occupant Safety Restraint Systems sold to certain automobile manufacturers at collusive and noncompetitive prices; and (h) engaging in

meetings, conversations and communications for the purpose of monitoring and enforcing adherence to the agreed upon bid rigging and price-fixing scheme.

193.   The plea agreement requires it and its subsidiaries to cooperate with the DOJ, including producing documents in their control and providing their "directors, officers and employees" for interviews and the provision of testimony in grand jury, trial and other judicial proceedings.

194.   The plea agreement further provides that upon acceptance of the agreement, the United States will not bring further criminal charges against, among other entities, TRW Germany's subsidiaries arising out of the conspiracy.

195.   Pursuant to the plea agreement, TRW Germany agreed that if the United States determines that it or its subsidiaries fail to provide truthful and continuing cooperation, the United could elect to subject TRW Germany or its subsidiaries to criminal prosecution and that the United States would have the right, among other things, to prosecute both TRW Germany and its subsidiaries for the conspiracy set forth in the plea agreement.

### Tokai Rika's Plea Agreement

196.   On December 12, 2012, Tokai Rika agreed to pay a $17.7 million fine and plead guilty to a two-count criminal information charging Tokai Rika with participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Heater Control Panels sold to an automobile manufacturer from at least September 2003 until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

197.   The information also charged Tokai Rika and one of its executives with obstruction of justice for directing employees to delete electronic data and destroy paper documents, which destroyed evidence relevant to the government's investigation into Tokai

Rika's antitrust violations in violation of 15 U.S.C. § 1512(b)(2)(B). Tokai Rika's plea agreement states "[a]fter becoming aware of the FBI search of the defendant's United States subsidiary, an executive of the defendant directed employees to delete electronic data and destroy paper documents likely to contain evidence of antitrust crimes.  As a result, electronic data were deleted and paper documents were destroyed, including data and documents evidencing antitrust crimes, and some of the deleted electronic data and destroyed paper documents were non-recoverable."

198.  Tokai Rika's plea agreement requires it and its subsidiaries to cooperate with the DOJ, including producing documents in their control and providing their "directors, officers and employees . . ." for "interviews and the provision of testimony in grand jury, trial and other judicial proceedings . . . ."

199.  According to the criminal information filed against Tokai Rika, Tokai Rika and its co-conspirators carried out the conspiracy by: (a) participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations; (b)agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted; (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of [Heater Control Panels]; (d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments; (e) submitting bids, price quotations, and price adjustments in accordance with the agreements reached; (f)selling [Heater Control Panels] in the United States and elsewhere at collusive and noncompetitive prices; (g) accepting payment for [Heater Control Panels] sold at collusive and noncompetitive prices; (h) engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the

agreed-upon bid-rigging and price-fixing scheme; and (i) employing measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection.

200.    Tokai Rika's plea agreement states that during a period from at least as early as September 2003 until at least February 2010 Tokai Rika's sales of Heater Control Panels subject to the conspiracy totaled approximately $73.6 million.

### Toyoda Gosei's Plea Agreement

201.    On September 29, 2014, the DOJ announced that Defendant Toyoda Gosei Co., Ltd. agreed to pay a $26 million criminal fine and plead guilty to a two-count criminal Information charging it with participating in conspiracies to:  (1) allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold in the United States and elsewhere from at least as early as February 2004 and continuing until at least September 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (2) allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold in the United States and elsewhere from at least as early as September 2003 and continuing until at least September 2010 in violation of the Sherman Act, 15 U.S.C. §

202.    According to the Information filed, Defendant Toyoda Gosei Co., Ltd. and its co-conspirators carried out the Occupant Safety Restraint Systems conspiracy by: (a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted for Occupant Safety Restraint Systems; (b) agreeing, during those meetings, conversations, and communications, to allocate among the companies sales of Occupant Safety Restraint Systems; (c) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted; (d) exchanging information on

bids and price quotations to be submitted; (e) submitting bids and price quotations in accordance with the agreements; (f) selling Occupant Safety Restraint Systems at collusive and noncompetitive prices; and (g) accepting payment for Occupant Safety Restraint Systems at collusive and noncompetitive prices.

### E.  Additional Criminal Pleas Related to Conspiracies in the Automotive Parts Industry

203.    In addition to Autoliv, Inc., Toyoda, Takata and TRW Germany, a number of other manufacturers of automotive parts have pleaded guilty, or agreed to plead guilty, to price fixing and bid rigging in the automotive parts industry, including: Furukawa Electric Co., Ltd.; Yazaki Corp.; G.S. Electech, Inc.; Fujikura Ltd.; Denso Corporation; and Nippon Seiki Co. Ltd. These companies have pleaded guilty to engaging in the same conduct as Autoliv, Inc. with regard to Automotive Wire Harness Systems, Instrument Panel Clusters, Fuel Senders and Heater Control Panels.  The majority of these violators pleaded guilty to engaging in bid-rigging, price-fixing, and market allocation during the same time period as Autoliv, Inc. with multiple OEMs as their targets.

### F.  Likely Existence of An Amnesty Applicant

204.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party who has been accepted into the DOJ's ACPERA program as an amnesty applicant.  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

205.     In light of the multiple guilty pleas in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

### G.  <u>Damage to Plaintiffs and Other Automobile Dealers Caused by Defendants' Illegal Activities.</u>

206.     Deputy Assistant Attorney General Scott Hammond, recently stated that the automotive parts cartel is "the biggest [cartel] with respect to the impact on U.S. business and consumers."

207.     Defendants' conspiracy resulted in Defendants charging inflated prices to firms who directly purchased Occupant Safety Restraint Systems from them and in those purchasers raising their prices to subsequent purchasers.

208.     Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Occupant Safety Restraint Systems they sold to Plaintiffs and the Classes, firms who sold such Occupant Safety Restraint Systems and vehicles passed Defendants' overcharges on to Plaintiffs and the Classes.

209.     Plaintiffs and the Classes are entitled to the overcharges they paid for Occupant Safety Restraint Systems.

210.     Plaintiffs and the Classes had to and did absorb, at the very least, a significant portion of the overcharges that they paid due to Defendants' illegal activities.

211.     Plaintiffs have standing and have suffered damage compensable by indirect purchaser laws and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy.

## CLASS ACTION ALLEGATIONS

212.    Plaintiffs[2] bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that during the Class Period,  (a) indirectly purchased Occupant Safety Restraint Systems manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Occupant Safety Restraint Systems manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

213.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, unjust enrichment and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, (except California as to unjust enrichment claims), as well as unjust enrichment laws of Missouri, Massachusetts, Illinois, and South Carolina.  The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, Illinois, and South Carolina are collectively referred to as the "Indirect Purchaser States."  These claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows (the "Damages Class"):

> All automobile dealers, in the Indirect Purchaser States, that, during the Class Period (a) indirectly purchased Occupant Safety Restraint Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) purchased vehicles containing Occupant Safety Restraint Systems manufactured by one of the Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

---

[2] Plaintiff Dale Martens is not included in the Nationwide Class.

214.   The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities, and instrumentalities of the federal government, states, and their subdivisions, agencies, and instrumentalities.

215.   Although Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class.

216.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Occupant Safety Restraint Systems sold in the United States;

(b)   The identity of the participants of the alleged conspiracy;

(c)   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)   Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

(f)   Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)   The effect of the alleged conspiracy on the prices of Occupant Safety Restraint Systems sold in the United States during the Class Period;

(i)      Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(j)      The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)      The appropriate class-wide measure of damages for the Damages Class.

217.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct because they paid artificially inflated prices for Occupant Safety Restraint Systems purchased indirectly from Defendants or their co-conspirators.

218.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

219.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

220.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism provide injured entities with a method for obtaining redress for claims that might not

be practicable to pursue individually and substantially outweigh any difficulties that may arise in the management of this class action.

221.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

222.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to Occupant Safety Restraint Systems;

(b)    The prices of Occupant Safety Restraint Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Defendants charged purchasers of their Occupant Safety Restraint Systems inflated, fixed and stabilized prices for such Occupant Safety Restraint Systems;

(d)    Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Occupant Safety Restraint Systems they sold to Plaintiffs and the Classes, firms who sold Defendants' Occupant Safety Restraint Systems and vehicles to Plaintiffs and the Classes passed Defendants' overcharges  on to them;

(e)    Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes; and

(f)    Automobile dealers purchasing Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems have been deprived of free and open competition.

223.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Occupant Safety Restraint Systems, as a result of Defendants' conspiracy.

224.    An increase in the prices of Occupant Safety Restraint Systems caused an increase in the price of vehicles during the Class Period.

225.    The market for Occupant Safety Restraint Systems and the market for cars are inextricably linked and intertwined because the market for Occupant Safety Restraint Systems exists to serve the vehicle market. Without the vehicles, the Occupant Safety Restraint Systems have little to no value because they have no independent utility and must be inserted into vehicles to serve any function.  Indeed, the demand for vehicles creates the demand for Occupant Safety Restraint Systems.

226.    Occupant Safety Restraint Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle and are not altered during the manufacturing process.  As a result, Occupant Safety Restraint Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Occupant Safety Restraint Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

227.    Just as Occupant Safety Restraint Systems can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Occupant Safety Restraint Systems affect prices paid by indirect purchasers of new motor vehicles containing Occupant Safety Restraint Systems.

228.    Occupant Safety Restraint Systems have their own part numbers, which permit them to be tracked.

229.    Occupant Safety Restraint Systems are pieces of sophisticated equipment that are necessary to operate a vehicle.

230.    Occupant Safety Restraint Systems are found in every modern vehicle and can be removed from a finished vehicle and replaced.

231.   The Occupant Safety Restraint Systems subject to Defendants' conspiracy and at issue in this lawsuit only have one use: to be inserted into vehicles.  Whether Occupant Safety Restraint Systems are sold by themselves or in vehicles, their purpose is to be inserted into vehicles to protect drivers and passengers from bodily harm.

232.   Occupant Safety Restraint Systems comprise a not insignificant portion of the cost of a vehicle.

233.   The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Occupant Safety Restraint Systems and, as a direct and foreseeable result, the price of new motor vehicles containing Occupant Safety Restraint Systems and the price of Occupant Safety Restraint Systems purchased for repair purposes.  Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis—called regression analysis—is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product or service that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of Occupant Safety Restraint Systems on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time.  A regression model can explain how variation in the price of Occupant Safety Restraint Systems affects changes in the price of new motor vehicles.  In such models, the price of Occupant Safety Restraint Systems would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of Occupant Safety Restraint Systems impact the price of new motor vehicles containing

Occupant Safety Restraint Systems while controlling for the impact of other price-determining factors.

234.    The precise amount of the overcharge impacting the prices of new motor vehicles containing Occupant Safety Restraint Systems can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and members of the Classes can be quantified.

235.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Occupant Safety Restraint Systems than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent and Plaintiffs' and Class members' damages are measureable.

**PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS**

A.    **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover the Claims**

236.    Plaintiffs repeat and reallege the allegations set forth above.

237.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until the public announcements of Autoliv's agreement to plead guilty, on June 6, 2012. Plaintiffs and Class members did not have knowledge of Toyoda Gosei's participation in the conspiracy until September, 2014, when the DOJ announced that Toyoda Gosei had agreed to plead guilty to participating in the OSS conspiracy.

238.     Plaintiffs and the members of the Classes are automobile dealers who purchased automobiles or purchased Occupant Safety Restraint Systems to replace or repair damaged or defective Occupant Safety Restraint Systems.

239.     They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the public announcements of Autoliv's agreement to plead guilty, on June 6, 2012 or the participation of Toyoda Gosei before September, 2014.

240.     No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the public announcements of Autoliv's agreement to plead guilty, on June 6, 2012, that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price-fix and rig bids for Occupant Safety Restraint Systems.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

241.     For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

### B.     Fraudulent Concealment Tolled the Statute of Limitations

242.     In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the public

announcement of Autoliv's agreement to plead guilty, on June 6, 2012. Plaintiffs and Class members could not have discovered Toyoda Gosei's participation in the conspiracy, until September, 2014.

243.   Because Defendants' agreements, understandings, and conspiracies were kept secret until June 6, 2012, Plaintiffs and members of the Classes before that time were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices for Occupant Safety Restraint Systems throughout the United States during the Class Period.

244.   Defendants had secret communications to collusively fix prices, rig bids and allocate markets for Occupant Safety Restraint Systems.

245.   Defendants also concealed their conspiracy by submitting bids to OEMs, to give the appearance of competition, despite having already determined, among themselves, who would win each bid.

246.   The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

247.   By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing.  Occupant Safety Restraint Systems are not exempt from antitrust regulation, and thus, before June 6, 2012, Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Occupant Safety Restraint Systems' prices before June 6, 2012 and a reasonable person would not have been alerted to file claims against Toyoda Gosei until September 2014.

248.     Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

249.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until June 6, 2012, when the DOJ announced that Autoliv had agreed to plead guilty to the conspiracy. Plaintiffs and members of the Classes had no knowledge of Toyoda Gosei's participation in the conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether it had participated in the conspiracy until September 2014.

250.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

251.     Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

252.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

253.    At least as early as January 2003, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Occupant Safety Restraint Systems, thereby creating anticompetitive effects.

254.    The anticompetitive acts were intentionally directed at the United States market for Occupant Safety Restraint Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Occupant Safety Restraint Systems throughout the United States.

255.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Occupant Safety Restraint Systems.

256.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Occupant Safety Restraint Systems have been harmed by being forced to pay inflated, supracompetitive prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

257.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

258.    Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for Occupant Safety Restraint Systems has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for Occupant Safety Restraint Systems sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States;

(c)     Prices for vehicles purchased by Plaintiffs and the members of the Nationwide Class containing Occupant Safety Restraint Systems manufactured by Defendants and their coconspirators were inflated; and

(d)     Plaintiffs and members of the Nationwide Class who purchased Occupant Safety Restraint Systems indirectly from Defendants have been deprived of the benefits of free and open competition.

259.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems than they would have paid and will pay in the absence of the conspiracy.

260.    Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

261.    Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems because they are required to purchase vehicles and Occupant Safety Restraint Systems to continue to operate their businesses.

262.    Plaintiffs and members of the Nationwide Class continue to purchase vehicles and Occupant Safety Restraint Systems, on a regular basis.

263.    Vehicles and Occupant Safety Restraint Systems continue to be sold at inflated and supracompetitive prices.

264.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

265.    Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

266.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF

**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

267.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

268.    From as early as January 2003 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Occupant Safety Restraint Systems in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

269.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for Occupant Safety Restraint Systems, to rig bids for the sale of Occupant Safety Restraint Systems and to allocate customers for Occupant Safety Restraint Systems in the United States.

270.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Occupant Safety Restraint Systems at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Occupant Safety Restraint Systems sold in the United States;

(b)     allocating customers and markets for Occupant Safety Restraint Systems in the United States in furtherance of their agreements; and

(c)     participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

271.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Occupant Safety Restraint Systems.

272.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

273.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

274.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Occupant Safety Restraint Systems at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Occupant Safety Restraint Systems.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Occupant Safety Restraint

Systems; and (2) Allocating among themselves the production of Occupant Safety Restraint Systems.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of Occupant Safety Restraint Systems has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Occupant Safety Restraint Systems sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Occupant Safety Restraint Systems or vehicles containing Occupant Safety Restraint Systems manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Occupant Safety Restraint Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

275.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Official Code §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Occupant Safety Restraint Systems prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Occupant Safety Restraint Systems or vehicles in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Occupant Safety Restraint Systems or vehicles in the District of Columbia, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems, including in the District of Columbia.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

276.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Occupant Safety Restraint Systems' prices were raised, fixed, maintained, and

stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

277.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

278.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(b)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

279.       Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)       Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Maine; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition: and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)       During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10. §§ 1101, *et seq.*

280.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)   During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

281.   Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Statutes Annotated §§ 325D.49, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Occupant Safety Restraint Systems prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)     During the Class Period Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

282.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Occupant Safety Restraint Systems or vehicles in Mississippi were deprived of free and open competition, including in Mississippi: and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Occupant Safety Restraint Systems

or vehicles in Mississippi paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems, including in Mississippi.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

283.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

284.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Occupant Safety Restraint Systems or vehicles in Nevada, were deprived of free and open competition including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Occupant Safety Restraint Systems or vehicles in Nevada, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems, including in Nevada.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

285.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)      During the Class Period Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

286.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-1-1, *et seq.*

287.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Occupant Safety Restraint Systems or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems when they purchased, including in New York, Occupant Safety Restraint Systems or vehicles containing Occupant Safety Restraint Systems, or purchased, including in New York, Occupant Safety Restraint Systems or vehicles that were otherwise of lower quality, than would have been absent the conspirators' illegal acts, or were unable to purchase Occupant Safety Restraint Systems or vehicles that they would have otherwise have purchased absent the illegal conduct.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above

is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

288.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Occupant Safety Restraint Systems or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Occupant Safety Restraint Systems or vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles including in North Carolina.

(b)    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

289.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

290.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Occupant Safety Restraint Systems prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)   During the Class Period Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

291.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Occupant Safety Restraint Systems or vehicles in South Dakota, were deprived of free and open competition including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased vehicles or Occupant Safety

Restraint Systems in South Dakota, paid supracompetitive, artificially inflated prices for

Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems

including in South Dakota.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on

South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business and property and are

threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint

of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs

and members of the Damages Class seek all relief available under South Dakota Codified Laws

Ann. §§ 37-1, *et seq.*

292.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant

Safety Restraint Systems price competition was restrained, suppressed, and eliminated

throughout Tennessee; (2) Occupant Safety Restraint Systems prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and

members of the Damages Class, including those who resided in Tennessee and/or purchased

Occupant Safety Restraint Systems or vehicles in Tennessee, were deprived of free and open

competition including in Tennessee; and (4) Plaintiffs and members of the Damages Class,

including those who resided in Tennessee, and/or purchased Occupant Safety Restraint Systems

or vehicles in Tennessee, paid supracompetitive, artificially inflated prices for Occupant Safety

Restraint Systems and vehicles containing Occupant Safety Restraint Systems including in Tennessee.

(b)       During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

293.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)       Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Utah; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)       During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

294.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the 9 Vermont Stat. Ann. §§ 2451, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)      During the Class Period Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq.* Plaintiffs are entitled to relief

94

pursuant to 9 Vermont Stat. Ann. § 2465 and any other applicable authority.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2451, *et seq.*

295.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Occupant Safety Restraint Systems or vehicles in West Virginia, were deprived of free and open competition including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased vehicles or Occupant Safety Restraint Systems in West Virginia, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems including in West Virginia.

(b)   During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

296.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)     During the Class Period Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

297.     Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Damages Class have paid

more for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

298.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

299.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD CLAIM FOR RELIEF

**Violation of State Consumer Protection Statutes
on behalf of Plaintiffs and the Damages Class
(All Claims except S.C. Code Ann. §§ 39-5-10 claim on behalf of Plaintiffs and the Damages Class
S.C. Code Ann. §§ 39-5-10 Claim on behalf of Plaintiff Hudson)**

300.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

301.     Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

302.     Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a)     Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

303.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)    During the Class Period, Defendants marketed, sold, or distributed Occupant Safety Restraint Systems in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)    During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

(c)    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)    The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.,* including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

(e)    Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business

and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of Occupant Safety Restraint Systems (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout California; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased Occupant Safety Restraint Systems or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Occupant Safety Restraint Systems or vehicles in California, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems, including in California.

(h)     Defendants' acts and practices are unlawful, fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(j)     The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Occupant Safety Restraint Systems (or vehicles containing them). Plaintiffs and the members of

the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

304.     Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Florida; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems; and (5) Reasonable purchasers in Florida were deceived into believing that they were paying competitive prices for their vehicles and Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unlawful, unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.,* and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

305.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Occupant Safety Restraint Systems.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Occupant Safety Restraint Systems because they were unaware of the unlawful overcharge and because they had to purchase Occupant Safety Restraint Systems in order to be able to operate their vehicles.  Defendants' conduct with regard to sales of Occupant Safety Restraint Systems, including their illegal conspiracy to secretly fix the price of Occupant Safety Restraint Systems at supracompetitive levels and overcharge consumers,

was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.

(c)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A.§ 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Occupant Safety Restraint Systems as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Occupant Safety Restraint Systems.

(d)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(e)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(f)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.,* and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

306.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Occupant Safety Restraint Systems they had purchased as replacements and inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Occupant Safety Restraint Systems were misled to believe that they were paying a fair price for Occupant Safety Restraint Systems or the price increases for Occupant Safety Restraint Systems were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

(e)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New

York; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles or Occupant Safety Restraint Systems in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles and Occupant Safety Restraint Systems in New York, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems, and were subjected to Defendants' deceptive practices.

(f)     Defendants knew that their unlawful trade practices with respect to pricing Occupant Safety Restraint Systems would have an impact on all purchasers in New York and not just the Defendants' direct customers.

(g)     Defendants knew that their unlawful trade practices with respect to pricing Occupant Safety Restraint Systems would have a broad impact, causing class members who indirectly purchased Occupant Safety Restraint Systems to be injured by paying more for Occupant Safety Restraint Systems than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(h)     During the Class Period, Defendants marketed, sold, or distributed Occupant Safety Restraint Systems in New York and their illegal conduct substantially affected New York commerce and New York purchasers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled manufactured, sold, and/or distributed Occupant Safety Restraint Systems in New York.

(j)　　Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

307.　　Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)　　Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)　　The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injuries to purchasers of Occupant Safety Restraint Systems and vehicles, and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)　　Defendants' unlawful conduct had the following effects upon purchasers of Occupant Safety Restraint Systems in North Carolina: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Occupant Safety Restraint Systems or vehicles in North Carolina, were deprived of free and open competition including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Occupant Safety Restraint Systems or

vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems including in North Carolina.

(d)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Occupant Safety Restraint Systems and vehicles. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Moreover, Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

(e)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold and/or distributed Occupant Safety Restraint Systems in North Carolina.

(f)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

308.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.,* and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

309.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in Vermont.

(b)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices

for Occupant Safety Restraint Systems.  Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence.  Defendants misrepresented to all purchasers during the Class Period that Defendants' Occupant Safety Restraint Systems prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Occupant Safety Restraint Systems, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Occupant Safety Restraint Systems at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF

**Unjust Enrichment**
**on behalf of Plaintiffs and the Damages Class**

310. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

311. Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*, except California. Plaintiffs also bring this claim under the laws of Missouri, Illinois, Massachusetts and South Carolina, on behalf of the Plaintiffs who have their primary places of business in those states and the class members in those states.

312. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Occupant Safety Restraint Systems.

313. Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Occupant Safety Restraint Systems.

314. Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

315. Pursuit of any remedies against the firms from whom Plaintiffs and the Class members purchased vehicles containing Occupant Safety Restraint Systems and Occupant Safety

Restraint Systems subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.       Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.       Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.       Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.       Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.       Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  November 21, 2014.

Respectfully submitted,

/s/  *Gerard V. Mantese*
Gerard V. Mantese
(Michigan Bar No. P34424)

112

David Hansma
(Michigan Bar No. P71056)
Brendan Frey
(Michigan Bar No. P70893)
Mantese Honigman Rossman and
Williamson, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com
dhansma@manteselaw.com
bfrey@manteselaw.com

Don Barrett
Brian Herrington
David McMullan
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Yifei Li
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Shawn M. Raiter
Paul A. Sand
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com
psand@larsonking.com

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker
Suite 801
St. Louis, MO  63101
Telephone:  (314) 226-1015
mflannery@cuneolaw.com

Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com

Thomas P. Thrash
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net

richard@duncanfirm.com

Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

*Attorneys for Dealership Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2014 I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

__/s/ Brendan Frey _____
Brendan Frey (Michigan Bar No. P70893)
Mantese Honigman Rossman
 and Williamson, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Phone: (248) 457-9200 ext. 203
Fax: (248) 457-9201
Email: bfrey@manteselaw.com